Good morning. May it please the Court, Stephen Bergstein for the Plaintiff Appellant. The District Court improperly granted summary judgments. I will focus on the hostile work environment claim. The evidence shows that plaintiff's co-workers routinely harassed him on the basis of his national origin and religion, and that defendants failed to properly investigate his complaints or to take them seriously, even though plaintiff had repeatedly complained about his work environment. Let me start with the severe or pervasive element of the hostile work environment claim. Plaintiffs in the form of his sworn testimony, his EEOC charge, his affidavit, we have a flurry of offensive comments based on plaintiff's religion, national origin. I'm not going to repeat them here, but it sounds severe to me that his co-workers were targeting him because he was a Coptic Christian from Egypt. The question is then whether the harassment was suggests pervasive discrimination, which is obviously finding an inference that we endorse, although the District Court moved away from that and said that he still can't win because there are for other reasons that it didn't alter the conditions of his workplace. That's not quite the analysis under Harris v. Forklift. I think the plaintiff's testimony that this went on and on. That's a quote that a co-worker would use various derogatory phrases over and over. This is the kind of pervasive harassment that violates Title VII. Plaintiff pointed out in his deposition at page 400, that's during Appendix 371, that after a certain meeting in which plaintiff had complained about his co-workers' improper financial shenanigans in the workplace, after that meeting, his co-worker never called me by my name after that, and he used to refer to me by these offensive comments relating to his national origin. So I think we satisfy the standard for severe or pervasive. We also have to show that the hostile work environment is imputed to the employer, and a jury can find that it is. The plaintiff complained repeatedly to his employer about the anything, it escalated. That testimony alone suggests that management's response to the harassment was ineffective. This court said so in Whidbey v. Garzarelli. We also have plaintiff's sworn testimony in his EEOC charge that when he complained about the environment, Doherty, the HR representative, verbally abused me, threatened to terminate me under false pretenses. This sort of evidence is throughout the record. He complained to different managers. They either didn't get back to him, or one of them down in Baltimore, who was director of operations or investigations, said, look, that's not my concern. Take it up with somebody else. I did, and she didn't do anything. Well, that's not my concern. So this is precisely the sort of negligence that the plaintiff has to show in order to impute the hostile work environment to management. So for these reasons... What is the remedy you seek from us? The remedy is the case should go to trial on the hostile work environment and the retaliation claim. So... So isn't he contending that the adverse employment action is that he got discharged, but we have a fight with another employee? That's the retaliation, right. Superseding, intervening cause? What about that? Well, five months after he last complained, he is terminated because of this altercation. So the five months is enough to make out the primary patient case. We have evidence that HR told the plaintiff that if you keep complaining, we'll fabricate charges against you and you'll be fired. That's evidence of discriminatory or retaliatory intent. That alone gets you a trial. You don't have to show pretext when you have direct evidence of retaliatory or discriminatory intent. This court said so in Henry versus Wyatt Pharmaceutical. But that's the fact that I think the main point on the retaliation, obviously, this is independent of the hostile work environment, but on the retaliation is that the other co-worker got reinstated through arbitration. But why doesn't that preclude you from having a trial on that? That means the co-worker can't sue for wrongful discharge. The plaintiff said he didn't do it, and he was innocent of fighting intentionally with his co-worker. The plaintiff's evidence that he didn't do it, he says, would have been recorded on tape. No one looked at the tape. Plaintiff swears that there was a camera in the hallway where this happened. No one looks at the tape complaining that the hostile environment will fabricate charges against you. And then he's terminated under conditions that plaintiffs said could have exonerated him, but nobody tried to corroborate his innocence. That's evidence of retaliation. I talked to Discovery. Did you explore whether or not there was a tape at one point or not? Sadly, I wasn't involved in Discovery. But the plaintiff's testimony was that he was there for 25 years. You're ready for trial. I mean, there are no further pre-trial proceedings arguably present. Correct. Okay. Thank you. Thank you. The EEOC has been given some time to say a few words. Maybe you could begin by telling us how this case initially was brought to your attention. The EEOC tries to look at all of the cases coming out of district courts involving statutes that we enforce. So that's how it came to our attention. The district court makes... How frequently, I'm just curious, it's a little unusual, how frequently does the EEOC submit amicus briefs in civil cases? I don't have an answer for you, but certainly we appear here fairly frequently. I personally have appeared here fairly frequently. The district court made three primary errors in its hostile work environment analysis. First, the court refused to consider relevant evidence. It said that comments or conduct that was not expressly discriminatory was irrelevant to the hostile work environment analysis. However, what the court did not consider is that much of this conduct and many of these comments were by the very same individuals who also engaged in expressly discriminatory harassment. This court has said over and over, in Raniola, Alfano, Cater, Puccino, the fact that it was the same individuals who engage in conduct that is not expressly, facially discriminatory and also conduct that is, is circumstantial evidence that the entire course of conduct was discriminatory. The court also refused to consider comments that Razmi overheard because they were not directed at him and called them just general... And I think my opponent here calls them just general anti-religion statements. In fact, these statements were not just general anti-religion statements, they were highly offensive statements such as the idea of God is garbage, priests are child molesters, priests are alcoholics, religion is for stupid people, Egyptians are inferior to Greeks. Even though these comments were not directed at Razmi, they are part of the totality of circumstances. They're relevant because he was aware of these So even though these comments were not directed at him, the fact that he was aware of them matters. And this court has said that in Torres, Cruz, Whitby, Petrosino. Contrary to what the district court said, Estrafio also directly insulted Razmi based on his religion. He calls him a pretentious Christian. He calls him an effing Christian. The indirect comments that Razmi overheard could very well have amplified the effect of the direct comments that were made to him, as this court recognized in Cruz. The second primary error that the district court made is it said the conditions of employment were not altered, even though a jury could find pervasive discrimination in this case. The court acknowledged that this pervasive discrimination consisted of what it called offensive and degrading comments, not just childish name calling, comments that were sufficiently offensive here to satisfy the objective test for altering the conditions of employment. So this is a de novo review, so this court can look at all that evidence, correct? Correct. And he's going up the food chain and making complaints about wage theft. Does he make these same complaints about this hostile working environment? It's intolerable. I can't stand it anymore. Yes, he does. And what stage does he do that? Because I thought it was about wage theft. And one of the things that the judge below said that kind of raised my eyebrows was, well, I think that it's probably the wage theft that gave rise to all these negative comments because these people had worked together for years. And that seemed to be a little bit speculative. But why wouldn't she know that he had gone and complained about the racial, you know, and religious comments? Well, that was in the record. But interestingly, a hostile work environment does not have to be the sole motive for discrimination, as this court recognized in Rivera. By saying that the harassers were, in the court's opinion, motivated, quote, more by personal animus than by discrimination, the court is implicitly acknowledging that discrimination may have been one motive. The case for the jury here would be, even though this may have been prompted by the wage theft allegations, they were working fine together. He makes the wage theft allegations. They're mad at him for that. But then to retaliate against him for that, they start harassing him based upon his religion and his ethnicity. Is that essential? That's that. Whatever triggered it, they harassed him in expressly discriminatory ways. They chose to harass him using these comments that referred to his national origin, that referred to his religion. They didn't have to do that. So where there are multiple motives for harassment, and there may have been here. It may have been the whistleblowing, as well as his national origin and religion. Where there are multiple motives, it's just impossible to disentangle how much was causing a hostile work environment. That is an issue for the jury. Thank you. Thank you. Thank you, Ms. Coleman. Mr. Solomon. Thank you, Your Honors. Marriott respectfully submits Judge Nathan was correct in all respects when she dismissed Mr. Rasmus' discrimination, retaliation, and hostile work environment claims. Because plaintiff does not appeal the dismissal of the discrimination claim and does not appeal the dismissal of the individual defendants, I'll briefly address the retaliation claim first. Judge Nathan, and forgive me, Your Honors, but I have been involved in the case since its inception, so I can point out as I go along where my opposing counsel has misstated parts of the record. Judge Nathan was right in dismissing the retaliation claim because he could not, and he still cannot, dispute that his employment, just like that of his co-worker, Mr. Pampanga, was terminated due to their verbal and physical altercation at the Essex House Hotel. Marriott has a zero-tolerance policy for workplace aggression and violence, which is perhaps the strongest legitimate non-discriminatory, non-retaliatory business reason for discharge in all of employment law. He made two points on that. The first point was that there was direct evidence of retaliation by the comment, keep your mouth shut about anything happening at the hotel. Those comments took place years prior. So the idea that, Your Honor, got it correct in terms of the intervening proximate cause, you're talking about more than a year and a half between his last complaint of the discriminatory comments in the summer of 2014. His theory is, I did nothing wrong in this fight. It was all the other guy's fault. But because they were looking for a way to fire me for years, this gave them the opportunity to do it. They didn't investigate it. They just fired us both. He was responsible, so he deserved to be fired. I understand. So what's your response? Your Honor, the record is very clear that there was an investigation. Every witness that was interviewed, that was available, who saw the altercation was interviewed. Mr. Pampanga was interviewed and he told his version of the story where he was pushed, shoved, took a swing at, spit in his face. Were there third parties who were interviewed who said? There were third parties who were interviewed who did not see the altercation, but did see how nasty and rude and obnoxious Mr. Razmi was towards Mr. Pampanga. The idea that they're arguing this belief that there are surveillance cameras in the corridor where the fight broke out is simply wrong. They asked during the discovery period to see the tapes. We responded that there are no tapes because there are no cameras. They could have easily asked for a site inspection. Had they done that, they would have seen what I saw with my own eyes when I walked down the corridor. There are no cameras in the corridor. So the idea that we are hiding evidence that would have exonerated Mr. Razmi is just fiction. Mr. Solomon, there isn't any question. Is there that there were factual questions here about discriminatory intent or motivation? No, Your Honor. There are no disputed issues of fact because that's not an issue that was ever raised. You're talking about the idea that a jury could fancifully create a thin air, a conspiracy where- No, I'm not suggesting fabrication by the jury or fantasies by the jury. I'm just asking whether there aren't factual questions. There are allegations made by the plaintiff regarding these various allegedly insulting statements. The investigation that was done by Marriott vetted those issues. No, I understand. I have no doubt that Marriott vetted it in complete good faith and that you have acted in complete good faith in saying that there was no discriminatory intent or motivation. But isn't that question ultimately for the jury? Your Honor, we have to go on the record that's before us. The record before us does not indicate ground sufficient to overturn the dismissal of the house-to-work environment claim or the retaliation claim. The comments that were made cannot be looked at in a vacuum. We can't ignore reality and Judge Nathan bent over backwards to give plaintiffs every possible inference in his favor when she came to her decision. Mr. Solomon, the district judge, as they noted, said there was evidence of pervasive discrimination, right? I understand that. We have to take the plaintiff's version, which is that he was constantly, after he made the complaint, Mr. Berkstein noted he said that they never called him by his real name again, that they continually insulted him using overtly ethnic terms, right? Judge Nathan analyzed the totality of the circumstances. She did observe the main calling was not because of his national origin or his religion. Why? That's the fundamental question. Well, if you look... Why? Let me get the question. Forgive me. Why isn't that a jury issue? She made the determination that because he had no problems for years, that this was all attributable to his wage theft allegation. I think she... Why can't a jury conclude that, as I noted, that not only did they want to retaliate in a way that used ethnicity and religion to harass him? I think the judge's opinion gives him that benefit of that doubt because she does assume that the main calling happened just like plaintiff described. Then she attributes it to the wage theft and not to any type of ethnicity or religion, even though they were overtly tied to that. But she did go beyond it and she did give him the benefit of that doubt by also recognizing that whatever happened to plaintiff, assuming that plaintiff said it happened exactly the way he said, it did not alter the conditions of his workplace because the plaintiff offered nothing to suggest that the alleged name calling caused him any issues at work. Why would he complain three different times in November 2013, May of 2014, January 2016? Isn't that evidence that it was bothering him? Whether it was bothering him or not doesn't change the standard. The standard... That's only one factor. A person who is being harassed based upon an impermissible factor, race, gender, ethnicity, if they're enduring it and performing well, you're not suggesting just because a person is performing well, but that means they can't still have a hostile work environment. You're not suggesting that, are you? I think that the judge was correct when she compared the cases cited by plaintiff and the fact, as cited by plaintiff, that they did not establish hostility because there were no impact to him in the workplace. Feingold is a case that the EEO cites. In that case, plaintiff proved the hostility resulted in something physical and tangible, a denial of proper training, feedback, and instruction. In Rivera, the comments and question... She's judging the law of the circuit. Does it have to be a physical impact of the hostile work environment? I'm saying that there are examples that we've all cited in our briefs, Feingold, Rivera, WC&M Enterprises, which show what the law is designed to protect. The law is designed to protect if someone is... It upsets them every day to go to work. If they continue to perform the job well and they're promoted or whatever they do, if it's bothering them, that's enough, right? Your Honor, the district court was correct in our view that not every petty slight and insult that makes somebody uncomfortable or unhappy is unlawful. It's not like he was called a Muslim extremist or he was involved in 9-11 or called a member of the Taliban. There was no N-word. There was no physical contact. There was no disruption at all in his workplace. There's no evidence in the record that he missed a second of work, that any part of his job performance declined because of his co-worker's so-called hostility. And that brings me to my last point, which is the strongest support for summary judgment, and arguably the one that Judge Nathan... If she made a mistake, she made a mistake by not focusing on the fact that there's no burden... There was no analysis of imputing co-worker harassment to Marriott. The record is clear that the individual defendants were union member banquet waiters, just like plaintiff. They had no supervisory authority or control, and in that case, under Feingold, this court's standard is that the plaintiff must show he had either no avenue of complaint or that Marriott knew the illegal acts and did nothing. Plaintiff certainly cannot meet the first element to impute liability because it's undisputed. Marriott repeatedly investigated his accusations, both at the hotel property and above the hotel property. The fact that their investigation could corroborate nothing of Mr. Razmi's allegations doesn't mean that he certainly had an avenue of complaint, and as the court understands, he complained quite a bit. And plaintiff cannot meet the second element of the standard because Marriott took reasonable corrective measures, despite the repeated investigations and the absence of any evidence that any of these co-workers did or said anything wrong or improper. What about in January 2016, he said he drove to Maryland. He spoke with the director of global investigations, who said he's telling him he had been insulted every day and that Mr. Wallace said they should take it to Ms. Hassinger, and then he told me he had done that. He said, I don't know. It's not my department. It's not a jury issue whether or not that was an adequate response. Your Honor, complaining to the wrong person and having him say, talk to the right person is not an adequate, is not nothing, because what we're talking about in the standard, according to Feingold, is that we knew the illegal act and did absolutely nothing. And the record is clear that we tried as well as we could under the limited, virtually non-existent evidence that Mr. Razmi completely… What did Ms. Hassinger do then? He never complained to Ms. Hassinger. The record is clear on that. The response depends on the gravity of the harm and the response to that harm. What did Marriott do when he complained? Every time he complained to Marriott, Marriott investigated. They talked to everyone. And even though they found no evidence of any wrongdoing, despite the fact that these allegations took place in rooms full of people, they counseled everyone not to do these name callings. Name calling is not to be tolerated. So even though these were petty slights, according to him, the N-word was never raised or anything close to it, there was no physical violence, there was no threatening conduct, there was no job interference, there were no witnesses to the alleged name calling that supported his claims, and the accused co-workers came up with numerous witnesses corroborating that they were innocent. And despite all of that, Marriott still warned the individual defendants that name calling would not be tolerated, whether they did it or not. Thank you, Mr. Salk, very much. Thank you, Your Honor. I gave you a little extra time, and let's hear from Mr. Bergstein, who's reserved two minutes. He did complain to Hassinger, and that's page 381 of the Joint Appendix at page 404 of his deposition. He complained to five or six different people, and the pattern was they either never got back to me, they told me it's not my job, or keep your mouth shut. That was Doherty. I want to emphasize the context of the keep your mouth shut comment by Doherty. Page 367 of the appendix, deposition pages 307 to 309, makes clear that was in the context of plaintiff's complaints about the hostile work environment, as opposed to his complaints about wage theft by the employees. Telling an employee to keep your mouth shut when he's complaining about the hostile environment is probably the last thing you say to somebody who's complaining about a hostile work environment. We heard that the comments did not alter the conditions of the workplace. Harris versus Forklift says you don't need a tangible consequence in order to have a hostile work environment claim, so long as the work environment is abusive. Most hostile work environment claims in this circuit involve repeated name calling as opposed to physical attacks or people getting fired, and they still have issues for the jury. As far as the claim that the comments were not serious, the comments were so vulgar that I couldn't even, I wouldn't feel comfortable repeating them in this court. Half of them involve the F word, and the others involve ethnic slurs that would offend anyone with normal sensibilities. Thank you. Thanks, Mr. Coleman. Thanks, Mr. Solomon. Well argued, and we appreciate it very much. We'll hear Delaware River Network, Ethel versus New York State Department, et cetera, and Millennium Pipeline Company. Mr. Yeager, go ahead. May it please the Court. Thank you, Your Honor. Jordan Yeager, Courtman and Hefner, on behalf of the Delaware Riverkeeper Network petitioners. The Clean Water Act, 33 U.S.C. 1342b3, makes it clear that a state permit that would authorize a discharge of pollutants into the waters, that before ruling on such an application, the state must ensure an opportunity for a hearing. That's what this case is about. That opportunity was not provided here. The explanation for why that opportunity was not provided was because this involved a general permit. There is nothing, while certainly the states and the federal government are able to utilize general permits, there's nothing in the Clean Water Act that exempts general permits writ the obligations of providing an opportunity for public participation. It may be that there are some general permits where, because of the nature of the activity and the nature of the submittals, where the Court can balance and say that the opportunity has been consumed within the agency's decision to issue the general permit. But as the courts, and the courts are divided on this, but as the Waterkeeper Court and the EDC Court have found, not all general permits are created equal. And there are some general permits for which, to obtain coverage, you need to submit details. And that's exactly the kind of permit regime we have here. The Stormwater Pollution Prevention Plan, the SWPPP, that's at issue here, required extensive details. This was a 400-page submission about not the ultimate effluent limitations. Those are set out in the general permit itself. But they contain details about the how, about how is this applicant, how are they proposing to go about this extensive activity? We're talking about over 150 acres. And it's that detail about the how that makes this case similar. It's a different factual setting than what was considered in the Waterkeeper case and what was considered in the EDC case out of the Ninth Circuit. But what is similar, that it's those details in what's submitted to the agency that makes this an application that isn't, that allows people to be entitled to public. There's no rejection. Once you submit the application, you automatically, it's an automatic grant of the permit, right? So there is a, by operation of law. There's no determination. So how can something be considered an application if there's no ruling? There's no determination. You get the permit. Well, the, I think they're two different questions. Is it an application and is it a ruling? Well, so the, I don't believe that the, that what comes after the submittal impacts whether the detailed nature of what you have to submit makes that an application. You're requesting coverage. That's the language of the general permit regime. That request for coverage, to say that's not an application for coverage, I think is a semantic distinction without a difference. Now with the Seventh Circuit, is that an independent producer's case? It, it is. The, in that case, there was, the EPA was involved and there was, that's the Texas case, I believe, Your Honor's referring to. The court's analysis there was not as detailed as it was in, in the Waterkeeper case from the circuit or in the EDC case from the Ninth Circuit. It really went to a Chevron deference very quickly and because the EPA was there and the EPA had expressed its rationale, it deferred to that rationale. But yes, there is a split at that level over whether as a general rule you must always allow for that, whether you would always treat it as an application. I don't know if there's a split. I think New York, Maryland, and the Seventh Circuit have all come out one way, right? Well, you're at the state level. Interpreting this issue, in addressing this issue, right? Yes, at the state level. What's the split then? Well, within the circuits, the, you can look at the Waterkeeper case from this circuit and the EDC case from the Ninth Circuit that addressed this question about the public participation under general permit regimes and whether the submittal of an application, and I don't want to put the rabbit in the hat in the words that I'm using, but whether the submittal of the documents for coverage as part of a notice of intent, whether that triggers the public participation requirements. And so you have this circuit, and again, in a slightly different scenario. Let me ask you about mootness because you didn't, they had submitted this letter in September and then they submitted an updated letter. Why isn't this moot if the project is over? So the, it's not moot for two reasons, but the basic standard, when we look at both of the elements of the standard, it's not moot. The first question is, first of all, whether everything, so let me revise that. There's really three answers to that. First, because of the nature of the activity, the restoration of the site is part of what this is all about. It's not simply the activity as the construction is going on, but it's also about were the plans that you submitted sufficient to allow the site to be restored so that going forward in time there isn't an unlawful level of discharge and pollutants into the waters of the United States. And so it's because of that ongoing, the ongoing nature of the activity because of the nature of the restoration activities that there's still an opportunity to address what's going on here if we have an opportunity for hearing. Let me, before you go much further, what exactly do you want from us? What's the decreto language that you're asking us to adopt? We are asking for a remand with, back to the permitting agency for an opportunity for hearing. And we would agree. And what will you do once you get there, if you get there? So then we would have to submit to the agency what the basis for that hearing request is. And as part of that, we would then- I have no idea what you want. We want the ability to submit comments that the agency would actually have to consider over the adequacy of the restoration activity. To do what? And then to do what? So that if, as a result of those comments, to consider those comments, and if as a result of those comments, it agrees that the restoration activities that are part of the plan are inadequate to require revisions to that restoration activity. What would that involve physically? It would involve the submittal of expert reports. And it would involve the opportunity for a hearing. So the- I want to go beyond hearings and lawyers. What is it that you attempt beyond- what do you as a lawyer for your client wish to achieve? What's the proverbial bottom line? We wish to achieve the- there are two elements. We wish to achieve the ability for the agency to hear the concerns about restoration, and we wish to- the opportunity to- I'm sorry, Your Honor. What do you want to know about the restoration? We want to improve the ability of this restoration activity to protect the waters of the United States. To do what? How? So the- when one looks at the- I assume you don't want to have a hearing ad infinitum. No. That's not what you want. There were numerous best management practices as a term of art. There were numerous best management practices that were chosen, numerous best management practices that weren't chosen. We could see from the record that the best management practices that were chosen resulted in problems. We want the opportunity for the agency to say, you need to do these other best management practices going forward so that there won't be damage to the waters of the United States. Okay, great. Thanks very much. On the- can I finish the question? Not really. Okay. You'll get up again. All right. Thank you, Your Honor. May it please the Court, Brian Ginsberg for the New York State Department of Environmental Conservation. This case is moot. There is no further relief that Petitioner could obtain in the present proceeding. Petitioner's demand for relief in his brief was to rescind or remand Millennium's construction coverage under the permit. As the letters that we and Millennium have submitted recently indicate with the notices of termination, that coverage is gone. That has been relinquished. The coverage that they want Millennium to no longer have, Millennium has forsworn. Any sort of remand or remittal for notice and comment on these restoration measures would be purely an advisory opinion because there's no more construction that has to take place. The issue with respect to the ongoing operation of these restoration measures is an issue of the operation of the elements of the ESU, of Millennium's ESU project, not an issue with respect to construction. The permit in this case involves only construction. And to the extent my friend on the other side paints that as some sort of a collateral consequence, this Court has never found such a consequence to keep a case that is otherwise moot to keep such a case alive outside of the criminal or the immigration enforcement context. I do want to move quickly, though, to the merits in case this Court does address them. Again, we think you don't need to. The case is moot. We also have threshold jurisdictional and timeliness arguments. But something my friend on the other side led with was the fact that not all general permits are created equal. Exactly. That's why we win on the merits of this case. The general permit here, Millennium's notices of intent under the general permit here did not delegate so much discretion to the owners and operators that they became the functional equivalent of permit applications under the Clean Water Act. Unlike the permit at issue in the Waterkeeper case that he refers to, this Court's earlier decision in Waterkeeper, some of the other circuit cases and the like, the general permit here incorporates specific and quantitative restrictions on construction activity. And I want to flesh that out a little bit because I think it might not have been fully fleshed out in the briefs. The best evidence of those specific granular constraining numerical limitations are the two voluminous manuals of standards that the general permit incorporates by reference. The first is the New York Standards and Specifications for Erosion and Sediment Control. That's referenced at JA 56. And the second is the New York Stormwater Management Design Manual at JA 59. These manuals prescribe a tightly constrained menu from which the means of satisfying the permit's effluent limitations may be achieved. And as to each such menu option, they impose detailed, granular, and in many cases numerical constraints as to how that option must be implemented. And with the time I have, I'll just give one example that I think really illustrates the point and how constraining this general permit is, how it does not delegate the discretion. So one example that's incorporated by reference from these manuals, the owner-operator must minimize sediment discharges. That's one of the effluent limitations set out in the permit. The manuals require that he has to achieve this effluent limitation in one of a handful of prescribed ways, one of which is planting grass for the purpose of catching or slowing the speed of stormwater runoff. And to give you an idea of just how constraining and how little this leads to owner-operator discretion, the manuals set forth a detailed table delineating what type of grass must be used, under which circumstances, when you can use Kentucky fescue grass versus Kentucky bluegrass versus ryegrass, and what the maximum allowable velocity of water through the grass can be, measured down to the half of a foot per second. So my friend's characterization that the permit here and the notices of intent that must be submitted under the permit here leave so much to owner-operator discretion that they fall into the waterkeeper realm is simply fanciful. This is the opposite of that broad delegation. So to the extent this Court is inclined to reach the merits, which, again, we think there's about three threshold reasons why you shouldn't, but to the extent this Court should reach the merits, we think that also provides an avenue for dismissal and to require the sort of hearing that my friend on the other side wants with respect to these individual notices of intent, it would completely eviscerate the administrative efficiency that motivated DEC to provide the general permit scheme in the first place. There have been about 1,000 notices of intent per year submitted under this permit, and you can imagine, I heard my friend talk about expert reports and the like to involve that sort of hearing, that sort of public commentary on each individual notice of intent, in addition to the public comment that was provided at the promulgation stage of the general permit would go against DEC's purpose in enacting the permit and go against Congress' will in allowing the permitting scheme first originated by EPA in the 70s to perpetuate. So with that, we'd ask that the petition be dismissed. Thank you. We'll hear from Mr. Morota. May it please the Court, Sean Morota for Millennium Pipeline Company, LLC. Again, I'll associate myself with the Department's comments that this case is really quite moot. The hook, the thing that they would like remanded or vacated is the extension of coverage under the general permit, but as the notices of termination that we filed and have updated yesterday, there is no more coverage under the general permit. There's nothing left for this court to vacate or remand. The coverage does not exist anymore. So there's really nothing left for this court to remand or vacate. And the general permit ends in January, right? It does end in January, and I think it's quite interesting, Your Honor, that the general permit ends, there is a new general permit that has been put out for comment to replace the current general permit, and I'm informed by my friend from the Attorney General's office who's informed by his client that one Delaware Riverkeeper has not commented on that general permit, which if what they really want is this sort of notice and comment situation, that's an excellent avenue to do it. And second, no one in commenting on that general permit. Will they be able to achieve the sort of things that Mr. Yeager was saying earlier? Under the, with respect to the next round? Under the new general permit, my understanding is it's a repeat of the current one in the offer of public participation. But if Delaware Riverkeeper thinks that is unlawful, they should comment on the new general permit and then challenge the new general permit judicially when it is finally finalized. But you can't do it in this case, where again, there is no more coverage under the general permit to even remand or vacate. And I think there's an additional problem with mootness because, you know, Delaware there was a remand or vacater. He says, well, we want to give comments. And then when you press and say, what would those comments say? They didn't really have an answer. Finally, at the end, you were told there were certain best management practices that could be implemented. But there is no suggestion that those best management practices that they wanted used have anything to do with anything that's left that Millennium could do. Because remember, it now comes down to restoration, right? Isn't that really what they're arguing? Well, restoration is complete. And there isn't a suggestion that the best management practices they want implemented have anything to do with restoration. In other words, that one of the best management practices they would want implemented, which again, they have talked about very generally, has anything to do with restoration or something about Millennium's restoration that was inadequate. And the mere... So restoration is complete. And if they don't like it, they know why they don't like it, as we said here today. Or they should know why they don't like it. They should, but I don't know if they do know why they don't like it. I mean, there was pressing. I said, what do you want them to do differently on the facts right now? And you didn't really get an answer. It was best management practices. Well, best management practices said in many different ways, some that relates, I think, to the construction, but nothing at least that I'm aware of that has been either said from the podium or said in the papers that relates to the restoration. So one, there's nothing left for the score to vacate or remand. And second, even if there were, it's not clear what they want Millennium to do. And a bare procedural right is not sufficient. I want to touch on the timeliness issue that hasn't been brought up to this point, because it's quite shocking that Delaware Riverkeeper thinks that either there is no time limit for them to bring their challenge, or it's a four-year time limitation for them to bring their challenge, which is really quite shocking for a statute that was meant to speed up challenges to extensions of coverage or any sort of challenge as to a FERC jurisdictional facility like this one. As we point out in our brief, Section 717RD of the Natural Gas Act does not create a cause of action and therefore does not fall within Section 1658A's four-year statute of limitations. It does not create a cause of action because it provides that the court shall have original and exclusive jurisdiction over any civil action. When statutes speak of jurisdiction over any civil action, that is the quintessential language for a statute that does not create a cause of action. Rather, it simply tells you where you bring your preexisting cause of action. The cause of action in this case is created under New York state law, and it's created under New York state law because the Clean Water Act requires there to be a cause of action under New York state law if they're going to engage in state-level permitting. So the notion that Delaware Riverkeeper today says, well, it's four years, when it would not be four years if this were brought under state law, and would not be four years if it were even brought under federal law, is simply incorrect, and the court, to the extent it does not dismiss on threshold mootness grounds, should make clear that it's not a four-year statute of limitations, and it's completely inconsistent with the purpose of Section 717D, which was to speed up these types of decisions. Finally, returning briefly to the merits, I think in addition to everything that my friend from the Department said, I want to emphasize one way in which this case is different than the Waterkeeper Alliance case from this circuit and the Environmental Defense Center case from the Ninth Circuit, which is simply that in those cases you were challenging either a regulation that authorized general permit or a general permit itself. But here, on page 12 of their opening brief, Delaware Riverkeeper says, we are not attacking the general permit, because of course they're not, because that would be untimely. They say, we're not attacking the general permit, we're just attacking the extension of coverage under the general permit. And that actually places this case much more like the Natural Resource Defense Council case from the New York Court of Appeals, where the New York Court of Appeals says, you know what, we're going to take the lay of the land as we find it. We're going to accept the EPA regulations. And what we're going to say is, well, under those EPA regulations, is this general permit in that case, and here even the extension of coverage, consistent with it? And the answer is yes. And it would be quite, I think, incongruous for this Court to disagree on the merits, because what you would then have is that for FERC jurisdictional facilities in New York, there would have to be notice and comment. But for non-FERC jurisdictional facilities under that New York Court of Appeals case, there wouldn't be notice and comment. And that would be a difficult split indeed, unless the Court has to agree. Thanks, Mr. Morano, very much. Mr. Yeager? Thank you, Your Honor. I want to go back to Your Honor's question on mootness, because the other two elements are the duration of the challenge activity and whether there's a reasonable expectation that plaintiffs will be subject to challenge action again. This is a case where my predecessor in the case sought a stay of the action so that the that stay was denied. So here we are. And what we're stuck with is a situation where we're going to see a continued—this is not just a Clean Water Action case. It's also a case under the Natural Gas Act. And one can't think about—hear the arguments without saying, not only don't we get an opportunity to be heard when the coverage is granted, because in addition to the automatic coverage that operates by operational law, there's also then a completion statement that's issued by the Department to say we consider it to be complete. We've looked at the details of the BMPs and consider them to be adequate. But you don't even get into court, and we— And this took over two years. I mean, what makes you think that if there were another general permit granted that your It seems like your client waited eight months after Millennium received the general permit to even bring this petition, and then there were some delays in the briefing. So I don't understand why you think if another general permit were issued, you wouldn't be able to litigate that. I just want to clarify the difference between the issuance of the general permit and the coverage action for this site-specific activity. Just to be clear, in my language— You're using the wrong language. I just want to make myself clear. I believe it was July of 2017 that the agencies, on the final notice of intent, issued its completeness. The action was then filed in late fall of 2017. So I don't know that it's as long as eight months. There's no question that it's beyond the 30 days. While my colleagues find it shocking that we're arguing that this is timely, the Third Circuit and the Fourth Circuit have both looked at this parallel situation. The Fourth Circuit in the Sierra Club case, the Third Circuit in the 2017 Delaware River Keeper Network case both looked at these. The Third Circuit one is the 870 F-3rd 171. The Fourth Circuit is 899 F-3rd 260. Both looked at these parallel set of issues and said that the four-year catch-all of 1658A applies and noted that Congress specifically enacted that section to alleviate uncertainty inherent in the practice of borrowing state statute of limitations. The other thing to keep in mind is because this is a National Gas Act case, this is a record review case. So we didn't have the ability under the Natural Gas Act, under the Administrative Procedures Act, to bring to you those details on the substance. This court is limited. Thank you, Your Honor. We reserve decision. We'll turn to the last case on our calendar, the Christa McAuliffe Intermediate Schools et al. versus Bill de Blasio. Yes, sir. Go ahead, Mr. Kizer. Good morning, Your Honors, and may it please the Court. My name is Chris Kizer, and I represent the appellants, Christa McAuliffe Intermediate School PTO, Chinese American Citizens Alliance of Greater New York, and the Asian American Coalition for Education. This case is about New York City's effort to inject racial consideration into the admissions policy at its renowned specialized high schools. One of the many virtues of schools like Stuyvesant, Bronx Science, and Brooklyn Tech is their objective admissions policy. These schools care about your SHSET score. They don't care about your race or who your parents are. About half of these schools, the students at these schools, come from low-income families, and even more of those are Asian Americans. However, the mayor and the chancellor are unhappy with the racial balance at the specialized high schools and seek to make the schools' demographics mirror those of the city as a whole. That means an ultimate goal of fewer Asian American students, even though most of those students, like those at Christa McAuliffe Intermediate School, come from low-income families, and many are the children of immigrants. The mayor and the chancellor sought to change the admissions exam requirement, but since that is enshrined in state law, they used their power over the city schools to alter the eligibility requirements for the Discovery Program. Discovery is designed to give a second chance for admission for low-income students who scored just below the cutoff. But in recent years before this current expansion, it was quite small, and schools with high cutoffs, such as Stuyvesant and Bronx Science, did not participate at all. As a means to accomplish these racial goals, the mayor and the chancellor required each specialized school to set aside 20 percent of their seats in each incoming class for Discovery students. Was it just racial, or wasn't it also geographic? So one of the concerns was, you know, people from these locations weren't going to those schools. There was an inadequate representation of the whole city in the schools itself on a Certainly, Your Honor, Mayor de Blasio has expressed concern that the city as a whole was not being represented. However, under Arlington Heights, so long as racial motivation is a motivating factor, and here the record is clear that the mayor and the chancellor considered race predominantly, or at least one of their major considerations for Let me ask you this. I mean, this new program, the new Discovery program doesn't, race is not criteria for the program. You can see that, right? I mean, there's no factor of race in terms of the students themselves, correct? That's right, Your Honor. All right. So the question is, this goes to the likelihood of success on the merits, is there any Supreme Court case, case from this court, or even broad knit to any circuit court, where the scrutiny has applied? What Supreme Court case or what circuit case where race was not a factor in the criteria where a court has said, even though race was not a factor in the criteria, we're going to apply strict scrutiny here? Your Honor, the closest is Lewis versus Ascension Parish in the Fifth Circuit. The first of those cases before it was sent to remand. I thought they used race to assign students in that case. As a redistricting, right? The district court in that case found that rational basis scrutiny applied simply because the geographic lines were race blind. However, the Fifth Circuit panel essentially asked for, required a remand in order to determine whether the, although the lines were geographic in nature, they were done with the purpose. Not just with the purpose, that they were using race. They were actually using race to assign students. Well here, and Your Honor, one of the factors in Lewis was that the parish school district itself had used racial modeling to determine the outcome and the panel, or the likely outcome of its plan. And the panel in that case thought that that was probative of. Let me ask you about Doe, the Third Circuit case. Do you think Doe is wrongly decided, or is that distinguishable from this case? Your Honor, we don't think that you would have to find that Doe was wrongly decided to rule in our favor. The court in Doe expressly held that there was no evidence in the record that there was any intent that a particular race be disparately impacted in that case. It was simply a case where the city of Philadelphia was redrawing the lines in order to improve diversity. And that's a case where without the intent to, as the Supreme Court said in Feeney, what matters under Arlington Heights is the decision maker's intent to adversely affect a particular group. The intent is not to adversely affect a particular group, but to increase diversity. You're saying that's an impermissible intent? You can't have the intent to increase diversity in the schools or some other area. Is that your position? Not precisely, Your Honor. Our position is that in a situation such as this, where the effect of the program is to take seats away from certain students. How do we know that? It seems like the data from the first year shows that there has not been what your clients were concerned about, this enormous impact on Asian students. Right? Isn't that what the first year shows? Your Honor. No impact, right? As for the 2019 data, first of all, it isn't in the record. And second of all, there's significant possibility that it could be an outlier, given that the city's own modeling of the data based on the effect of this plan, based on 2017 numbers, shows that there would be. It may be, but this is a preliminary injunction review. You're saying the district court should have granted a preliminary injunction, even though there's no indication you have to differ. Well, I mean, the district didn't have this, but why wouldn't it be more prudent to see if there's going to be this disparate impact that you talk about? Your Honor, even taking the 2019 data they submitted at face value, the racial purpose of the plan still persists, and the students, particularly at Crystal McAuliffe Intermediate, who the PTO we represent, are still locked out of 20% of the seats at the specialized high schools. And the city's purpose for that, according to the mayor and the chancellor and the press releases and the Department of Education's presentation, was to change the racial balance to the detriment of Asian American students. So the fact that the data in 2019 might not have accomplished what the city expected it to, or spit out the numbers the city expected, doesn't necessarily mean that the students at the ineligible middle schools, such as Crystal McAuliffe, which is more than two-thirds Asian American, aren't being excluded from those seats on the basis of racial considerations under Arlington Heights. Can you address, in the Jana Rock case, quoting the Supreme Court, he said, to equate desire to eliminate the discriminatory impact on some disadvantaged groups with an intent to discriminate against other groups could seriously stifle attempts to remedy discrimination. So what's your response to that? Your Honor, a broad reading of that quotation from Jana Rock would essentially eviscerate Arlington Heights. It would permit jurisdictions to discriminate using facially neutral means against overrepresented races in order to create a racial balance that they desire, even though the disparate impact was not caused by city or district policy. So the proper reading, I think, of those quotations from Hayden and Jana Rock is essentially that, of course, in the remedial context, the Supreme Court has recognized a compelling interest in remedying past discrimination, and also that there are certain facially neutral policies that may be permitted to be enacted. However, it can't be extended to the point that you would... What concerns me, I'm not sure I see where the line is then, if you're saying a race neutral policy that is designed to achieve greater diversity, if it's going to have a disparate impact on some group, ethnic group or group that is not discriminating, isn't that what you're saying? I think the distinction, Your Honor, is between whether the policy is designed to improve opportunity for certain groups versus to change the outcome. So the Supreme Court in Ricci explained that, of course, the city of New Haven in that case could have taken steps to provide greater opportunity for the minority test takers to and gave a new one, that was disparate treatment. So here what we have is that the city has taken an established process and changed the rules so that the same exam, the SHSET, would spit out different results that they hoped would be more amenable to them demographically. Mr. Keyes, let me ask you a threshold question. You claim that you have associational standing. Standing is, of course, one of these ambiguous, seemingly ambiguous requirements in American law, but what exactly is your standing here? Without going to the merits that we have already treated to some degree, you're claiming you have so-called associational standing? Your Honor, we contend that the PTO has associational standing because its members, that it has standing to sue on behalf of its members. Let me just read you a segment of one of our cases in 2011. It is the law of this circuit that an organization does not have standing to assert the rights of its members in a case brought under 42 U.S.C. section 1983 as we have interpreted the rights of section 1983 secured to be personal to those purportedly injured. Your Honor, I recognize that there are certain Second Circuit cases, including, I believe that's NEB. Yes. NNEB versus DAUS, D-A-U-S. Yes, Your Honor, that have held categorically that associations cannot assert the rights of their members in section 1983 cases. However, that's contrary to Supreme Court precedent, including Northeastern Florida Association of General Contractors and parents involved, and in this circuit. But if so, we're in an awkward situation, aren't we? That is, assume for the argument you're right that the law of our circuit is in conflict with either the law of another circuit or with the law as stated by the Supreme Court. We as a court are institutionally bound to apply our own law, the law of the circuit, until it's reversed by an in-bank court, an in-bank rehearing of our court or by the Supreme Court, right? Yes, Your Honor. However, there have been panels of this court that have simply applied the three-part associational standing test in Hunt versus Washington State apple growers. For example, just a few months after the Northeastern Florida decision in the Supreme Court, this court decided Rent Stabilization Association versus Dinkins, where it discussed at length the effect of Northeastern Florida and simply distinguished it because the were not amenable to group representation. So this court has recognized that Northeastern Florida changed the law, and in other cases, the court has done that as well. So I think there's a conflict within panels in this court, and this panel could go one way or the other. However, I also believe that the institutions, I just want to say quickly that the institutions have standing to sue in their own right, as the district court found correctly. And procedurally, we're now at the, as Judge Bianco noted, at the preliminary injunction stage. So what exactly do you want from us here today? We're seeking, Your Honor, a remand with instructions to grant injunction before the 2020 cycle. A preliminary injunction, presumably because you... Preliminary injunction. Have you had any evidentiary hearings? We are still in discovery at the district court, so which... You haven't had any evidentiary hearings before the district court? No, it's currently... So what you would like is a remand for the completion of discovery and then a full trial on the merits. Yes, Your Honor. Presumably a consolidation of the preliminary and permanent injunction hearings. Yes, Your Honor. Okay, thanks. Mr. Moore? Yes, and may it please the court, my name is John Moore, representing the mayor and the chancellor. The district court did not abuse its discretion in denying plaintiffs the extraordinary relief of a preliminary injunction, where plaintiffs lack standing, cannot show irreparable harm, and are unlikely to succeed on the merits. I want to start on the threshold issues that the opposing counsel ended on. And there's a key point that decides this case on two independent threshold issues. And that key point is, as Judge Cabran has pointed out, that this circuit's law has consistently been, over the course of 40 years, and as recently reaffirmed as this last spring in the pool decision, that organizations do not have standing to assert the rights of their members. Now, plaintiffs say, well, just ignore that law because there's other cases that don't specifically speak to that issue that may come in tension with it. Or that there's an apparent tension with Supreme Court precedent. None of that Supreme Court precedent, to the extent that there is tension, I want to point out that those decisions did not specifically address the question. At most, they assumed it. That none of those Supreme Court decisions post-date this last spring, where the court recently reiterated the exact same rule that's followed. No, but their alternative argument is that even under the, by expending resources that they themselves have standing under, I don't know how you pronounce it, NEMBE, and other cases that have said if an organization has to expend resources to, in this case, oppose this plan, that that gives them standing independent of their members. So. And that's incorrect, Your Honor. And on that point, I direct Your Honor to the knife fights case from 2015. That was the facts of that case. I don't know. That wasn't changing the law. It was basically that whether or not there were going to people be prosecuted under that. Well, what the challenge, so in the knife fights case, there was a statute banning, it was a state law that banned the possession of gravity knives. And what plaintiffs were challenging was the application and interpretation of that law as it was going forward. And the organizational plaintiffs had dedicated resources to opposing that application and enforcement. Here, we have a state law that sets the requirement. In that case, ultimately, it was decided it wasn't clear that everyone was going to be prosecuted under that law. And that, therefore, the ongoing expenditures of resources was, I guess, speculative, right? Well, it was speculative, particularly because the organization themselves didn't face the risk of prosecution, that any future expenses that they incurred would be on behalf of their members, which is not the kind of standing that the plaintiffs here or there can extend. We know they continue to expend resources to keep opposing this indefinitely, right? Well, they say that in their reply brief, but they did not say that in their complaint. They did not say that in the first round of affirmations. And they didn't say that in the second round of affirmations. So to be able to assert standing based on a claim that's not made until their appellate reply brief would be inconsistent with the usual rules governing how standing has to be established. Even if I take that point, and again, I think the knife rights case does control it. I think it's on all fours with this instance. But even if there were Article III standing, if there's the ability to proceed with the case at all, there's still the second independent threshold issue, which is irreparable harm. If the only harm that the organizational plaintiffs have the ability to assert is their expenditure of time, money, and resources, that's... You didn't raise that below, and then we shouldn't even consider that. I disagree. If you're on a look to page 244 of the appellee's appendix, what we argue is that there is not irreparable harm because none of the plaintiffs are imminently going to be participating, with the exception of Mr. Wong's daughter, are imminently going to be participating in the Specialized Admissions High School project. So you're arguing that below? So that's the same argument we're making, that there's no irreparable harm because these particular plaintiffs... You make that argument that the district court is the question. Yes. So that was the argument below, and that's the argument that we're making now. And it plays out somewhat differently, and let me explain why that is. In the district court, the irreparable harm argument was ultimately... Wouldn't have gotten this very far, that the organizational plaintiffs can't show irreparable harm, because Mr. Wong's daughter was still in the case. Here, where it is conceded that she is no longer participating in the admissions process, where she's no longer have standing... This is, I believe, footnote one in Apollo's reply brief. Why is that? Because she's aged out? Well, because she's already been placed into a high school. That's one of the famous problems with all of these cases, because from a defendant's point of view, you can wait out any individual plaintiff will have graduated, or will have moved out of the relevant group by the time a decision is made, right? Yes, I want to make two points in response to that. The first is that there's the possibility of pleading damages. And so to the extent that that's the harm, that you can allege past damages for past action, you don't have to get into prospective relief. And second, that ultimately speaks to the standing to proceed with the case at all. It doesn't speak to the irreparable harm question. Then again, if the irreparable harm, what they're established, what their harm is, is the ability to seek, is their past expenditures, the money, time, resources. The Supreme Court in Sampson said that's not enough. Well, Mr. Moore, let me try a contrafactual question for you. If you were on their side, how would you cure this problem? What should they, in other words, what should they have done to pursue this case to at least achieve standing to proceed? So had they alleged in their complaint, both past expenditures and the willingness, ability, inclination to continue doing so, to make clear that they were imminently likely to need to continue doing so, I think that would cure it. If they had alleged... Sorry, I'm not understanding. What exactly would that claim be? It wouldn't have to be much. It would basically have to be, we have opposed this and we will continue doing so as long as the policy is in place. As an association. Correct. And that would get them the standing at least to proceed with the case. All right. Alternatively, they have fled damages. So why don't we just pause right there? Since a remand is necessary in any circumstance, if I understand your position, they can simply seek to amend their complaint by making precisely that claim, right? I believe... That's what I'm getting at. Yes. Although the knife rights case, which, as I referred to earlier, actually denied the ability to replead. But if the court were inclined to do so, I don't think knife rights controls on that. Then the case could be dismissed, again, entirely for standing with leave to replead. And they could remake those allegations. You don't have to dismiss it. You can just permit an amendment to the complaint, right? Yes. You're in the middle of discovery or whatever it is that's going on in the district court. It's not nearly a final judgment. Why can't they do that? No, I think they could. But they could also include a number of individual plaintiffs who are young enough to perhaps survive the many delays, right? Why couldn't they do that? Well, I think it's a little trickier because if we're talking about third grade students, they're not imminently likely to be applying for specialized high schools. But I take the point. On the other hand, by the time you're through with them, they'll be in graduate school. I take the point and to step back just a little bit. None of this helps on this appeal. None of this helps plaintiffs on this appeal. Why? Because they're still unable to show irreparable harm. They're still not able to show as organizations that their constitutional rights are going to any harm. And with... If they were to have students added on remand who were applying now, right, this current cycle, so they then had irreparable harm, right? Potentially. Different plaintiffs could have standing and could have irreparable harm. Why wouldn't the judge then have to, on this question of serious questions and the balance of hardships, some of the things that the district court relied upon wouldn't apply right now, right? Because part of it had to do with the offers were about to go out. They had been going to printing. It wasn't time to redo the criteria, but we're in December. So wouldn't on remand, the district court have to now determine whether or not an injunction would be appropriate for this cycle? It would. So the circumstances have changed. And I think though that ultimately the circumstances haven't changed that much just because of the time it's taken to litigate this case. We're now approaching the time, and I appreciate the opportunity to make this point because it's on my must say list. Is that in order for the Department of Education to be able to issue orders on a, not orders, I apologize, offers on a timely basis, the Department of Education is informing me that they would need a decision from the court, ideally by the end of the month, which I'm not going to presume to set deadlines for the court, but that's the timeline that we're looking at the extension by January. It could be done with delays beyond that. What is it that could be done in theory or hypothetically by the end of the year? So to change the procedures and process by which the offers are made. And so if we were to revert back to the prior discovery program, that would happen. Which would amount to either an amendment or supplanting the preliminary injunction with our own injunction, right?  That's what you're suggesting. So if the court... By the end of the year. Correct. And so on that, so having said that, I want to turn briefly to discuss the merits of the case. I am, let me just ask you this question on the merits. This to me is the bottom line question. Isn't it, isn't it, on the issue of what the intent of this is, isn't it to achieve racial demographics in these schools that most, more closely mirror the city? Isn't that the purpose of this new discovery program? I don't know if I, if I fully agree with that. The purpose of the program is to increase racial socioeconomic and geographic diversity through the specialized high schools. And that consideration then, so certainly race is a consideration that comes into that. But that, the mere fact that race is considered is not itself grounds to trigger strict scrutiny. And I want to point out that the best case that the plaintiffs offer for this in their argument was the Lewis one decision from the fifth circuit. They omit the fact that all the court in Lewis one decided was that we need that the court needed a little more facts to decide it. On Lewis two, when the case returned the fifth circuit. Determine that race was the primary reason for this plan, that altering the racial demographics was the primary reason for the plan. Wouldn't that implicate strict scrutiny? I don't think so. No, there's two points on that. First, I don't think that's the case here. I think that race is certainly one consideration. It's not the primary consideration. Second, in order to get the strict scrutiny, you have to show both intent primary consideration that it's not, I don't know if I don't know that I could say that there's a primary consideration. Again, racial socioeconomic and geographic diversity. Moreover, the intent has to be not just to eat, to consider race and to benefit one group. It has to specifically be to harm a group. And that's absent here. Despite plaintiff's allegations to the contrary, the mayor's and chancellor's comments are very clearly designed on bolstering the enrollment of an underrepresented group into the specialized high schools. That's been a desire and I have written down plaintiffs agree that the intent must be to create an adverse effect. That's not the goal here. Finally, you also have to show even if there were intent, which I think I made clear, I strongly disagree. Both the chancellor and the mayor have suggested that it is their intention or it's arguably their intention. Have they been deposed yet? No, they have not been. And part of the reason for that is that in order, in addition to showing intent, plaintiffs have to be able to show effect in order to get the strict scrutiny. And on that point, their claim completely fails. I mean, most dramatically, the biggest, the largest beneficiary of the new discovery program criteria have been Asian Americans. Their numbers increased overall and is specifically within the discovery program. The intent was not primarily race and was just to help disadvantaged students. The amicus brief points out there are a lot of different ways this could have been framed to do that. They give the example and I want you, I'm curious what your response to this is. If you have an Asian American child who's in a homeless shelter on welfare, if they go to a certain school, this program is not available to them. Does that make sense? Why would, if race is not the primary reason and you're just trying to reach disadvantaged kids, there are other ways this could be done just based upon economics as opposed to the way it's currently framed. Well, the program as it's currently structured is based on economics and it's based on two separate economic considerations. One is that the poverty of individual students matters. And we agree with that. The other point is that the poverty of the schools in which they give and that hypothetical doesn't matter how poor that kid is, he's not getting into this program, right? That's correct because if we're talking about what economic considerations have to be in place, we're looking at rational basis review. And the Department of Education has the ability to say that not only is individual poverty important, but the poverty of the neighborhood, the poverty of the school in general matters. That a student who is themselves poor and could be direly in dire straits, who is nonetheless attending a more affluent school, it is not an unreasonable determination to say that that student is not as disadvantaged as someone who is also individually poor and also attends a school where the majority, where the large majority of students are also facing similar problems, similar poverty. That is a consideration that the Department of Education is able to make and did make and that explains the criteria here. Thanks very much. Thank you, Your Honor. Mr. Keezer is reserved one minute. Thank you, Your Honor. I just want to make two quick points. First, on the institutional standing and irreparable harm, which are kind of related. The declarations that we submitted in February to the district court, they clearly outline that our expenditures and opposition, especially as far as the PTO and CACAGNY are concerned, are ongoing and as Judge Bianco pointed out, they will continue as long as this program is in place and there is simply no other remedy because this is a continuing program that will be a continuing violation. Now, you heard our colloquy before about how you can cure this associational standing issue if it is indeed an issue. That is not a problem for you, right? On remand, we would certainly consider those things. And, Your Honor, the second point on racial intent, it is simply not true that there needs to be any particular animus towards a particular racial group in order to find that race was a motivating factor under Arlington Heights. Feeney clearly states that all that is necessary is that the decision maker decided to do what it did because it would have an effect on a particular racial group and that is all that we have here. Thank you. Thank you very much. We will reserve decision and we are adjourned.